IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| JOSEPH W. GENTRY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:04cv0069 |
| ) | |
| JO ANNE B. BARNHART, Commissioner of ) | Judge Thomas A. Wiseman, Jr. |
| Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM ORDER**

The case was referred to United States Magistrate Judge E. Clifton Knowles pursuant to 28 U.S.C. § 636(b)(1)(B). Thereafter, Plaintiff Joseph W. Gentry filed a motion for judgment on the administrative record and supporting brief (Doc. Nos. 11 and 12) seeking reversal of the Commissioner's decision denying benefits. The Commissioner of Social Security ("Commissioner" or "Defendant") filed a response opposing Plaintiff's motion (Doc. No. 14). Magistrate Judge Knowles filed a Report and Recommendation ("Report") (Doc. No. 16) recommending that this matter be remanded on the grounds that the Commissioner considered Plaintiff's age under an inappropriate legal standard. Plaintiff and the Commissioner have both filed timely objections to the Report (Doc. Nos. 17 and 18).

Upon review of the Administrative Record as a whole, the Magistrate's Report and the parties' objections, the Court finds that Plaintiff's objections are without merit but Defendant's objection is well taken. Accordingly, the Court will **REJECT** the Magistrate's Report, and **DENY** Plaintiff's motion for judgment. The Commissioner's decision denying benefits is hereby **AFFIRMED**.

**I.    INTRODUCTION**

    **A.    Procedural Background**

Plaintiff filed this civil action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner 's finding that Plaintiff was not disabled and denying his petition for disability insurance benefits ("DIB").

Plaintiff filed his current application for DIB on May 31, 2001, alleging that he had been disabled since January 19, 2001 due to high blood pressure, diabetes, stress, and "possible heart or lung problems." (Doc.

No. 9, Attachment, Administrative Record ("AR") 78–80, 92.) Plaintiff's application was denied initially and upon reconsideration. (AR 58–61, 64–65.) Plaintiff requested and received a hearing. (AR 66, 25–29.) The hearing was conducted on July 28, 2003 before Administrative Law Judge ("ALJ") William F. Taylor. (AR 32–51.) The ALJ issued a written decision denying Plaintiff's application on September 25, 2003. (AR 16–22.) The Appeals Council denied Plaintiff's request for review (AR 5–7), thereby rendering the ALJ's decision the final decision of the Commissioner.

This civil action was thereafter timely filed, and the Court has jurisdiction pursuant to 42 U.S.C. § 405(g). The Court referred this matter to the Magistrate Judge who has recommended that the Commissioner's denial of benefits be reversed and that the matter be remanded for further consideration. Both parties have objected to the Magistrate's findings.

### B. Factual Background

Plaintiff was born in 1947. As of the date of the hearing he was 56 years old, and he is currently 58 years old. He received approximately a tenth-grade education and as not received any formal vocational training. (AR 35.) He last worked on a full-time basis in 2001 at Wind Ridge Nursing Home as a supervisor of housekeeping (AR 37), where he had been employed for about twenty years. (AR 93.)

#### *(1) The Medical Evidence*

Plaintiff alleges disability due to high blood pressure, diabetes, stress and "possible heart or lung problems." (AR 92.)

Plaintiff was treated for "acute pneumonia" and underwent a "right thoracotomy and decortication" of his right lung in February 1988. (See AR 251–52, 254–55, 258–63, 265.)

Plaintiff was treated by Dr. Renata Nowak from February 9, 2000 until October 30, 2001. (AR 184–218.) At the "initial visit" on February 9, 2000, Dr. Nowak noted that Plaintiff had been diagnosed as diabetic two years previously and was having difficulty controlling his blood sugar. He had high cholesterol and elevated TSH according to lab work done in 1999. Dr. Nowak's impression was hypertension ("HTN"), hyperlipidemia, hypothyroidism and poorly controlled diabetes. Plaintiff did not have chest pain, shortness of breath, or swelling in the legs. (AR 210.) In a follow-up exam in April 2000, Dr. Nowak noted again that Plaintiff's diabetes was poorly controlled and she again stressed the need for diet and weight control. Plaintiff's blood hypertension was fairly well controlled and his hypothyroidism managed with medication.

2

(AR 209.) Dr. Nowak specifically noted no swelling in the lower extremities. (AR 209.)

In June 2000, Plaintiff complained of "more swelling" in right lower extremity and a small ulceration on his right foot that was not healing well. Dr. Nowak prescribed diabetic shoes. (AR 207.)

In August 2000, Dr. Nowak ordered lab work. (AR 206.) On September 5, 2000, Plaintiff was "doing okay" and had no active complaints of chest pain ("CP") or shortness of breath ("SOB"). (AR 206.) He had stopped losing weight, however, and was still having difficulty controlling his blood sugar. He was "again advised about diet," and warned he might have to go on insulin if he did not lose weight. (AR 206.) A chest x-ray performed on September 9, 2000 showed "no active pathology or change from previous x-rays." (AR 139.)

In January 2001, Dr. Nowak noted Plaintiff's hypothyroidism, hypercholesterolemia, and diabetes were all fairly well or well controlled. (AR 204.) Insomnia was noted, along with an umbilical hernia, and Plaintiff was referred for a colonoscopy. (AR 203.) Plaintiff also had an inflamed abscess on his back, which Dr. Nowak treated. (AR 204–05.) At a walk-in appointment on April 25, 2001, Plaintiff reported he had fallen and injured both his shins. On the right shin there was a small laceration with redness around it. Dr. Nowak diagnosed cellulitis and prescribed antibiotics. (AR 198.) Also in April 2001, Dr. Nowak noted that Plaintiff was again (or still) having difficulty controlling his blood sugar, but had no complaints of shortness of breath, chest pain or swelling in the lower extremities. (AR 199–200.)

In May 2001, Plaintiff complained of swelling in his lower extremities and reported that he had been sleeping in a recliner for three months because he experienced shortness of breath if he lay flat. The physical exam revealed "no [chest pain], very minimal swelling in lower extremities." (AR 196.) Dr. Nowak ordered a stress test and echocardiogram. The results of the stress test were normal. (AR 226.) A chest study performed at the same time revealed no significant change compared to chest x-ray performed on September 24, 2000. (AR 227.)

In June 2001, Plaintiff reported that his breathing felt better but complained of lightheadedness and dizzy spells. (AR 193.) Plaintiff's blood pressure appeared well controlled, however, and Dr. Nowak again stressed the need to control weight. (AR 193.) In July 2001, Dr. Nowak reported that Plaintiff's diabetes was "fairly well controlled" and Plaintiff was trying to lose weight by exercise and diet. (AR 192.)

On July 9, 2001, Dr. Nowak issued an order referring Plaintiff, for a sleep study (AR 164). The study

3

was performed in August 2001 by Dr. Lilibeth Pineda. Dr. Pineda reported that Plaintiff did not meet the criteria for obstructive sleep apnea, though he did have "abnormal sleep architecture" and "poor sleep hygiene" since he slept sitting up with the television on. (AR 224–25.)

On August 8, 2001, Dr. Donita Keown performed a consultative examination. (AR 165–68.) In her assessment, Dr. Keown found that Plaintiff's was obese and had an umbilical hernia, and trace edema in his lower extremities. Otherwise, she found he had full range of motion in his shoulders, elbows, hands, hips, knees, ankles, and thoracolumbar column. His station and gate were unremarkable and he had full motor strength in hands, arms and legs. She assessed his capacity for work as follows:

> [The claimant] has symptoms suggestive of neuropathy in the lower limbs. At current, he does not have any ulcerations but has some signs of poor wound healing in the lower extremities.
> He has trace edema in both lower limbs and subjective complaints consistent with congestive heart failure. The cardiac exam did not show lateral displacement of the PMI and S3 or S4, or tachycardia.
> The claimant complains he is short of breath. He has clear lung sounds with no wheeze or rale, and was not appreciably short of air at any time during our exam.
> Based on today's exam, the claimant could sit 6 hours in an 8-hour day; walk or stand 4-6 hours in an 8-hour days; routinely lift 10 pounds; episodically lift 20 pounds.

(AR 167–68.)

On October 2, 2001, Plaintiff complained to Dr. Dr. Nowak of right knee pain. The physical exam revealed slight swelling but no tenderness. (AR 190.) Plaintiff also complained of "[e]xertional SOB [shortness of breath]," which Dr. Nowak attributed to severe obesity and recommended an exercise program. She nonetheless referred Plaintiff for a pulmonary consultation for a second opinion. (AR 189.)

Plaintiff was referred to pulmonologist Dr. Pineda again. Dr. Pineda's notes for October 23, 2001 indicate Plaintiff was referred by Dr. Nowak for "increasing shortness of breath." Plaintiff was described as a 54-year-old male with a "history of hypertension, NIDDM [non-insulin depending diabetes mellitus], and hypothyroidism." He reported shortness of breath for the past year that was much worse in the past six months, during which time frame he had also gained about 30 pounds. He reported he had lost his job in January 2001 "due to a job cut." (AR 221.) The physical exam was remarkable only for obesity and mildly diminished breath sounds bilaterally, which Dr. Pineda associated with the weight gain and obesity. Dr. Pineda referred Plaintiff for a pulmonary function test ("PFT").

On Plaintiff's follow-up visit with Dr. Pineda, November 8, 2001, Plaintiff was still complaining of

4

exertional dyspnea, but he reported that he had been exercising every day, walking and using an exercise bicycle. (AR 219.) Dr. Pineda reported that the laboratory data from the PFT was "consistent with restrictive respiratory impairment, but no airways obstruction." (AR 219.) Dr. Pineda felt the restrictive lung disease was "likely secondary to obesity," and "strongly encouraged [Plaintiff] to continue with this healthy habit of regular exercise." (AR 219.)

Plaintiff began seeing Dr. S. Kanagasegar as his primary care physician in February 2002. At the first visit, February 5, 2002, Dr. Kanagasegar noted that Plaintiff had been seen by Dr. Nowak until four months ago and came to Dr. Kanagasegar because of an insurance change. (AR 236.) In the "history" section of his the record, Dr. Kanagasegar noted that Plaintiff complained of "shortness of breath with minimal exertion," "orthopnea but not PND," and right-side chest pain, numbness in both feet and hands of several months duration, and he had gained about 10 pounds in the past six months. (AR 236.) Past medical history included hypertension for 20 years, diabetes for five years, hyperthyroidism [sic] of one year, hyperlipidemia, and shortness of breath. Plaintiff reported he had recently undergone a stress test, echocardiogram, and PFT, but was unsure what the results were. He had had right lung surgery secondary to pneumonia about 14 years ago. (AR 236.) Physical exam was unremarkable except for small umbilical hernia and "clinical evidence of peripheral neuropathy just below the knees on both sides as well as in both hands." (AR 236–37.) Dr. Kanagasegar ordered blood and urine tests, recommended regular exercise, and advised Plaintiff to continue his medications.

On March 4, 2002, Plaintiff complained about pain in his right knee of six-month duration, worse after activity and "standing for a long time." (AR 235.) Plaintiff had no chest pain or shortness of breath, though he was complaining of cold symptoms. He was given a steroid shot in his knee and a prescription for Naproxen, and samples of Allegra to treat his cold symptoms.

Dr. Kanagasegar's note from April 16, 2002 indicates that Plaintiff reported his right knee pain was much better since he had received the steroid injection and he continued to take Naproxen. Plaintiff was "quite pleased about his diabetic control," was "doing regular exercise now to lose weight and he is also careful about his diet. . . . He denies any chest pain or shortness of breath." (AR 234.) Plaintiff's only complaint was regarding impotence, for which Dr. Kanagasegar prescribed Viagra and explained "in detail about how to use" it. Otherwise, Plaintiff was advised to continue his current medications. (AR 235.)

5

In July 2002, Plaintiff complained of unusual fatigue and generalized muscle aches and shortness of breath with minimal exertion. He also complained of a "headache . . . over the right temporal region but no blurred vision, diplopia, photophobia, or fever." Dr. Kanagasegar felt the headache and muscle aches could be related to hypothyroidism, Zocor, or temporal arthritis. He ordered a metabolic profile and other tests and directed Plaintiff to stop taking Zocor. (AR 295.)

At a follow-up exam in October 2002, Plaintiff reported his fatigue was "slowly getting better." (AR 293.) He also reported a new medical symptom: He complained he could not "do a lot of weight lifting, which he used to do before. He says that he used to lift weights about 150 to 160 and now he can hardly lift 75 pounds but he denies any pain around both shoulder girdles or pelvic girdle." (AR 293.) His right knee was still noted to be painful but he had full range of motion. Clinically, there was "no obvious evidence of weakness." Dr. Kanagasegar ordered a test for testosterone level (which turned out to be normal, AR 300), administered a steroid shot to the knee, and ordered a knee x-ray (which showed only "mild degenerative spurring" and no evidence of degenerative joint disease, AR 301). Otherwise, Plaintiff was advised to continue on his various medications. (AR293.)

At an exam in January 2003, Plaintiff reported he had no chest pain or shortness of breath. He complained only of having a runny nose and productive cough. His weight was 310, but he had no edema. He was continued on his medications for diabetes, hypertension, and hypercholesterolemia, and changed medications for allergic rhinitis. (AR 288.)

The next note from Dr. Kanagasegar is dated April 2, 2003 and indicates Plaintiff had presented to the emergency room the prior week for shortness of breath and cough, which had responded well to antibiotics and two Nebulizer treatments. Plaintiff was still complaining of exertional shortness of breath and chest congestion ("whitish phlegm"). Plaintiff also reported that he was still walking regularly for exercise and had no chest pain. The physical exam was unremarkable except for some bilateral wheezing due to recent acute bronchitis. (AR 285.) A chest x-ray was basically unchanged compared with study done in May 2001. (AR 297.)

In May 2003, Dr. Kanagasegar noted Plaintiff had fallen and injured his right lower leg, and the wound on his right leg was not healing properly. Plaintiff also complained of swelling in lower extremities, especially by the end of the day. (AR 330.) Plaintiff was advised to continue medications, given Augmentin

6

for possible cellulitis of right shin. A new echocardiogram was ordered, and Dr. Kanagasegar noted that he would consider a referral to a cardiologist. (AR 330.) The echocardiogram results revealed a "moderate degree of left ventricle dilation[, a]trium is borderline dilated[, a]ortic root is borderline dilated[, m]oderate degree of mitral valve insufficiency[, e]levated pulmonary artery pressure[, and d]ilated inferior vena cava." (AR 315, 332.)

### *(2) Residual Functional Capacity Assessments*

A DDS consultant completed an RFC Assessment on August 19, 2001. Dr. Denise Bell assessed Plaintiff as being able to lift 50 pounds occasionally, 25 pounds frequently, to stand or walk about 6 hours in an 8-hour workday, and to sit about 6 hours in an 8-hour workday, with an unlimited ability to push or pull. The evidence listed in support of the conclusions indicated that Plaintiff had hypertension, unspecified "heart lung" issues, diabetes, shortness of breath, leg and foot swelling. The references to the medical records are basically illegible (AR 171), but indicate that they did not give rise to concern. (AR 172.)

Dr. Nowak completed an RFC Assessment for Plaintiff in October 2001. She opined that Plaintiff could occasionally and frequently lift 10 pounds, stand or walk a total of less than 2 hours in an 8-hour workday, and sit less than 6 hours in an 8-hour workday. Dr. Nowak wrote some notes on the side in support of her assessment as to Plaintiff's ability to walk/stand, but these notes are illegible. (AR 185.) She stated Plaintiff's ability to push and pull was unlimited, that he could occasionally balance, and stoop but could never climb, kneel, crouch or crawl. She stated that his sensory abilities were unlimited except for "feeling." She noted Plaintiff had chronic right knee pain and "on and off" back pain (which is nowhere indicated in the medical records). (AR 185.) She felt his experience of pain was "often" severe enough to interfere with his attention and concentration, that he was capable of a low stress job, and that he would need to take five unscheduled breaks per day. He would need to elevate his legs with prolonged sitting, and his impairments would likely produce "good days" and "bad days," and would also result in his being absent about three days per month. (AR 186.)

In December 2001, Dr. Pineda completed a Residual Functional Capacity Assessment for Plaintiff in which she indicated she was not able to assess his ability to lift, stand/walk, sit, push or pull. She did state that Plaintiff's obesity resulted in restrictive lung disease but that "oxygenation is adequate" and she did "not see any significant disability or impairment as far as the lung goes." (AR 232–33.)

7

Dr. Kanagasegar apparently never completed a Residual Functional Capacity Assessment for Plaintiff. There is no indication in the record as to whether he was ever asked to do so.

### *(3)* *Plaintiff's Testimony*

At the time of his hearing, July 28, 2003, Plaintiff was 56 years old and had a tenth-grade education. (AR 35.) Plaintiff testified he was able to read and write English, and could add and subtract. (AR 36.) Plaintiff reported he did not possess a driver's license and had never possessed one; Plaintiff stated he had driven in the past. (AR 36.) When asked if he smoked, Plaintiff stated, "Occasionally." (AR 36.) He did not drink alcohol or use street drugs like marijuana or cocaine. He was not then working, and the last time he worked was in January 2001, when he filed for disability. (AR 37.) He last worked as a "[w]orking supervisor" of housekeeping at Wind Ridge Nursing Home. (AR 37.)

When asked what medical problems he had that prevented him from working, Plaintiff stated that he could not "get around like he used to," and that he was "weak and [could not] walk very far and . . . just fe[lt] bad all the time." (AR 40.) He reported that Dr. Renata Nowak had been his primary care physician, then "Dr. Kenneth Seger [sic]," and finally "Dr. Willades (Phonetic) Panetta (Phonetic)" [sic] who evaluated his lung condition." (AR 40.) Plaintiff reported that he had not been told what caused his shortness of breath, but he had been told he had congestive heart failure. (AR 41.) He claimed he had shortness of breath when he was just "sitting around" and when he tried to walk around, that he had difficulty walking up a flight of steps and was unable to sleep on a regular bed at night. Instead, he had been sleeping in recliner for "about four years." (AR 41.) Plaintiff claimed the recliner assisted his breathing. (AR 41.)

Plaintiff claimed he could walk no more than ten minutes at a time without sitting down and resting because he became weak and out of breath. (AR 42.) He also claimed that his diabetes caused him problems, including numbness in his hands and feet, starting three years prior. He claimed the condition had not changed in the past three years. (AR 42.) He claimed he had knocked a toe nail off "the other day" but had not known it until he had looked down and seen the blood. (AR 42.) He also reported that he had difficulty walking since the numbness affected his balance and caused him to stumble. (AR 42–43.) He testified that the numbness had extended up above his knees for the past year. (AR 43.) He also testified that his feet were discolored, black and blue, and that he had swelling in his feet and legs "all the time." (AR 43.) He claimed the only way to relieve the swelling was to sit in his recliner with his feet raised for most of

8

the day. (AR 43.)

Plaintiff also reported that he had numbness in his hands which made it difficult to pick things up and to write, and that sometimes his wife had to button his shirt. (AR 43–44, 46.)

Plaintiff claimed he had arthritis in his right knee which hurt "a lot." (AR 44.) He testified that he "used to walk a lot" but no longer could because his knee "bother[ed him] a lot." (AR 44.)

He also claimed he had a hernia "for some years," that no doctor had ever recommended surgery to correct it, but he was unable to lift much because it hurt. (AR 44.) When asked how much he tried to restrict his lifting, Plaintiff stated, "Well, Dr. Nowak told me not to pick up no more than ten pound[s]." (AR 45.) Plaintiff claimed this made it difficult for him to do work around the house and that he had stopped being able to mow the yard "about a year ago." (AR 45.) Even when he did mow the lawn, he would push the mower for ten minutes and then sit down to rest and catch his breath. (AR 45.)

When asked if he worked inside the house, Plaintiff stated that he did the dishes and vacuumed the floor. He claimed it took him "[p]robably about 15, 20 minutes" to wash dishes, and that if he got tired while doing them he would lean on the counter and rest a minute before continuing. (AR 45–46.)

Plaintiff testified that he did go fishing "every once in a while," as often as once a month if the weather was pretty. He did not have any difficulty with that because he would just sit on the bank. (AR 46.)

In describing his "typical day," Plaintiff stated he would get up, and after his wife went to work he would wash dishes, vacuum the floor, and sit down. Then he would get up and go sit on the porch, and that was "about it." (AR 46–47.) Sometimes he would fall asleep sitting in his recliner. (AR 47.) He also stated he did not sleep well at night in that he would wake up and not be able to go back to sleep. As a result he was fatigued during the day. (AR 47.)

Plaintiff stated he did not get out and do things with groups of people, did not attend church or belong to any clubs. (AR 47–48.)

According to Plaintiff he was 6'2" and weighed about 310 pounds. He claimed to have gained about 20 pounds since he had quit working but did not know why. (AR 48.) He had been told to watch his diet and blood sugar but still had difficulty controlling his blood sugar. (AR 48.)

### *(4) Vocational Testimony*

Vocational expert ("VE") Rebecca Williams also appeared and testified at Plaintiff's hearing. (AR

9

37–40, 49–50.)

The VE noted that Plaintiff identified his prior job as "working supervisor" of housekeeping, and that the housekeeper component of Plaintiff's past relevant work would be classified as "medium and unskilled," and the supervisor component would be "light and skilled." (AR 38.) Plaintiff's attorney interjected that there was an "earlier evaluation by a Vocational Expert that found [Plaintiff's relevant work experience] was consistent with supervisor/janitorial services under DOT 381.137-010," which was classified as medium work. (AR 38.) The testifying VE expressly disagreed with that assessment and explained that she felt that DOT 381.137-010 described a supervisor of janitor services, who supervises and coordinates the activities of workers engaged in cleaning and maintaining the premises of commercial and industrial and other establishments. (AR 38.) She felt that Plaintiff's past work was more consistent with DOT 187.167-046, for housekeeping administrator, which is classified as light work. She conceded that a janitor services supervisor and a housekeeping administrator "do essentially a lot fo the same thing" (AR 38) and there was not a "huge difference between the two" (AR 49), but the main difference appeared to be that the housekeeper supervisor was over one institution whereas the janitorial supervisor oversaw workers at more than one institution. (See AR 39.) The ALJ stated he would take both categories under consideration. (AR 40.)

The ALJ also presented the VE with a hypothetical situation paralleling that of Plaintiff:

Q. I want you to assume we have a 56-year-old male claimant who has ten years of education and has the ability to read and write English, can add and subtract. Assume this person does not have a driver's license so he cannot have a position that would require him to operate an automobile. Assume his past work has been as a housekeeper, medium, unskilled, and as a supervisor of housekeeping, light and skilled. And assume further that this person would be able to occasionally lift ten pounds, frequently lift 20 pounds [*sic*], be able to sit for six hours in and eight-hour day and stand or walk for six hours in an eight-hour day. Would the individual I have described for you be able to do any of his past relevant work?

A If he would only be able to do the supervisory component on the past work (INAUDIBLE) housekeeping (INAUDIBLE).

(AR 49–50.)

The ALJ went on to ask the VE about other jobs this hypothetical person could perform, and the VE testified that there were other jobs at the light level that such a person would be capable of performing.

## II. THE ALJ'S FINDINGS

The ALJ correctly set forth the five-step sequential evaluation to be performed, noting that at step

10

four, if the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled; and that at step five, if his impairments prevent him from performing his past relevant work but other work exists in the national economy that accommodates his residual functional capacity and vocational factors, then he is not disabled. (AR 17.) In his discussion, however, he somewhat conflated these two steps: After taking into consideration the Plaintiff's limitations and the VE's testimony, the ALJ concluded that, considering the claimant's age, educational background, work experience, and residual functional capacity, he is capable both of performing his past relevant work as a housekeeper supervisor and making a successful adjustment to work that exists in significant numbers in the national economy." (AR 21.) In reaching the latter conclusion, the ALJ erroneously stated that Plaintiff, then age 56, was defined by the regulations as "an individual closely approaching advanced age (20 CFR § 404.1563)." (AR 20.)

> The ALJ's specific relevant findings were as follows:
>
> 5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.
>
> 6.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).
>
> 7.  The claimant has the residual functional capacity for light work activity.
>
> 8.  The claimant is able to perform his past relevant work as a housekeeper supervisor as normally done in the national economy (20 CFR § 404.1565).
>
> 9.  There are a significant number of additional jobs in the national economy that he could perform . . . .

(AR 21.) Accordingly, the ALJ found that Plaintiff was not disabled both at step four (able to perform past relevant work) and at step five (able to perform other jobs in the national economy).

### III. THE MAGISTRATE'S REPORT

In his Motion For Judgment and supporting Brief, Plaintiff objected to the ALJ's conclusion on a number of grounds, including his failure to give Dr. Nowak's opinion controlling weight, his finding that Plaintiff was capable of performing his past work, and in finding that Plaintiff did not qualify for disability under Medical-Vocational Rule 202.02 when he reached aged 55. The Magistrate found that remand was appropriate because of the ALJ's error in applying Medical-Vocational Rule 202.02 to find that Plaintiff, at age 56, was "closely approaching advanced age" rather than a person of "advanced age." See 20 C.F.R. § 404.1563(e). On the basis of this error, the Magistrate found that it was "not apparent from the Record if the

11

ALJ considered whether Plaintiff qualified [for disability] under Medical-Vocational Rule 202.02," and that remand was therefore required. (Doc. 16, at 20–21.)

Having reached the conclusion that remand was appropriate, the Magistrate judge nonetheless went on to address Plaintiff's other contentions, and found that the ALJ did not err either in discounting the opinion of Dr. Nowak as to Plaintiff's RFC nor in classifying Plaintiff's past relevant work as "light."

## IV. THE PARTIES' OBJECTIONS

Although the Magistrate recommended that this matter be remanded, the Plaintiff objects to the Magistrate's findings that (1) the ALJ did not err in finding that Mr. Gentry's past work was light in exertion; and (2) the ALJ did not err in finding that Plaintiff had a residual functional capacity for light work.

The Commissioner, on the other hand, objects to the Magistrate's recommendation that this matter be remanded because of the ALJ's mistaken statement that Plaintiff, at age 56, was "closely approaching advanced age" instead of already being considered, under the regulations, as a person of "advanced age." The Commissioner does not argue with the fact that Plaintiff, under the regulations, is a person of "advanced age." In fact, the Commissioner has conceded that the ALJ's alternative denial of benefits at step five was improper, at least as of the date Plaintiff turned 55. (See Doc. No. 14, at 5 n.1.) She argues, however, that this Court should affirm the ALJ's finding of no disability at step four of the analysis, because age does not enter into the equation until step five.

As set forth below the Court finds that Plaintiff's objections are without merit, and the ALJ's conclusion that Plaintiff is able to perform his past work is supported by substantial evidence. As a result, the Court will affirm on that basis. Accordingly, remand for consideration of disability at step five, which would take Plaintiff's age into consideration, is not required.

## V. DISCUSSION

### A. Standard Of Review

The Court's standard of review for a Magistrate Judge's Report and Recommendation depends upon whether a party files objections. Where the parties have objected to portions of the Report and Recommendation, the Court reviews those portions *de novo*. Lyons v. Comm'r of Soc. Sec., 351 F. Supp. 2d 659, 661 (E.D. Mich. 2004).

Under the Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of

12

Case 2:04-cv-00069 Document 19 Filed 02/21/06 Page 12 of 19 PageID #: 45

disability. The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). This Court, therefore, is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. See Abbott v. Sullivan, 905 F.2d 918, 922 (6th Cir. 1990). If substantial evidence supports the ALJ's conclusion, this Court cannot reverse the ALJ's decision even if substantial evidence exists in the record that would have supported an opposite conclusion. Youghiogheny & Ohio Coal Co. v. Webb, 49 F.3d 244, 246 (6th Cir. 1995). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. See Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantiality is based upon the record taken as a whole. See Houston v. Sec'y of Health & Human Servs., 736 F.2d 365, 366 (6th Cir. 1984).

> **B.** **Evaluation Entitlement To Social Security Benefits**

Title II of the Social Security Act (the "Act") provides for disability, survivors, and retirement insurance benefits. Under the Act, Plaintiff is entitled to receive benefits only if he is deemed "disabled." 42 U.S.C. § 423(d)(1)(A). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

In applying the standards for determining disability, the Secretary has promulgated regulations setting forth a five-step sequential evaluation process. See 20 C.F.R. §§ 404.1520 and 406.920. An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. See id. The Sixth Circuit has summarized the steps as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

13

> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

See Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 529 (6th Cir. 1997); 20 C.F.R. § 404.1520(b)- (f). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at step five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. See Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). Consideration of a claimant's age *only* enters into the equation at step five, not step four. See 20 C.F.R. § 404.1560(b)(3) ("If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. *We will not consider your vocational factors of age, education, and work experience or whether your past relevant work exists in significant numbers in the national economy.*") (emphasis added); Barnhart v. Thomas, 540 U.S. 20, 24 (2003) (holding that the Commissioner's interpretation of 42 U.S.C. § 423(d)(2)(A), that vocational factors are not considered when determining if a claimant can return to his PRW, is reasonable and entitled to deference).

Further, where an ALJ makes alternative findings, for instance by finding no disability at both step four and step five, this Court may affirm the ALJ's decision on either or both findings. Reversal or remand is required only if neither of the alternative findings is supported by substantial evidence. Cf. Murrell v. Shalala, 43 F.3d 1388, 1388 (10th Cir. 1994) (encouraging alternative findings, and noting that "the integrity of a step-four finding is not compromised in any way by the recognition that step five, if it were reached, would dictate the same [or different] result") (modification in original).

### C. The ALJ's Finding Of Disability At Step Four

The factual findings that supported the ALJ's conclusion of no disability at step four of the sequential evaluation included his findings that Plaintiff had a residual functional capacity for light work and that his past relevant work experience, either as he performed it or as it is performed in the national economy, 20 C.F.R. § 404.1560(b)(2), was properly classified as light work. If both of those findings are supported by substantial evidence, then the ALJ's finding that Plaintiff was capable of performing his PRW, as well as his finding at step four that Plaintiff is not disabled, must be affirmed.

**(*1*)** *Substantial evidence supports the ALJ's finding that Plaintiff*

14

***has a residual functional capacity for light work.***

Plaintiff argues that the Magistrate erred in finding that the ALJ gave adequate weight to the treating physician's assessment that Plaintiff was incapable of performing even sedentary work. More specifically, Dr. Renata Nowak completed an RFC for Plaintiff on October 30, 2001, in which she opined that Plaintiff could occasionally lift and/or carry 10 pounds, frequently lift and/or carry 10 pounds, stand and/or walk a total of less than 2 hours in an 8-hour workday, and sit a total of less than 6 hours in an 8-hour day. (AR 185.) In addition, Dr. Nowak noted that Plaintiff could occasionally stoop and twist but could never climb, kneel, crouch or crawl. (AR 185.) Dr. Nowak also stated that Plaintiff's pain was "often" severe enough to interfere with his attention and concentration, that he would need to take approximately five unscheduled breaks during an eight-hour work day, and that his legs should be elevated with prolonged sitting. (AR 186.) Dr. Nowak further believed that Plaintiff would need to be absent from work "[a]bout three times a month" as a result of his impairments or treatments therefor, and that his impairments were "likely to produce 'good days' and 'bad days.' " (AR 186.)

The medical opinion of a treating physician in a social security disability case is to be given substantial deference, and, if uncontradicted, complete deference. Walker v. Sec'y of Health & Human Svcs., 980 F.2d 1066, 1070 (6th Cir. 1992). Where the treating physician's opinions are contradicted or supported only by conclusory statements, the ALJ may reject such determinations but still must, as Plaintiff correctly points out, articulate a reasonable basis for not accepting them. Shelman v. Heckler, 821 F.2d 316, 321 (6th Cir. 1987).

In this case, Dr. Nowak's opinions on the RFC are contradicted by other evidence in the record, including the assessments done by Drs. Pineda and Keown. The ALJ noted that he rejected Dr. Nowak's RFC report on the basis of these other assessments and on the ground that it was not supported by the medical evidence of record and appeared to be based only on Plaintiff's subjective complaints. The ALJ also based his finding on the objective medical evidence that indicated that Plaintiff's chest pains were not cardiac related; his alleged shortness of breath was not caused by restrictive lung disease; and x-rays of his right knee showed only mild degenerative changes. Further, while Plaintiff testified he could not lift more than ten pounds because of a hernia, he had the hernia while he was performing allegedly medium work as a housekeeper supervisor and doing heavier lifting than that. (AR 19.) The ALJ also noted that Plaintiff

15

testified that he had stopped work due to his impairments, but he told Dr. Kanagasegar that he was laid off from his job.

The Court finds that the ALJ sufficiently articulated a reason for rejecting Dr. Nowak's RFC assessment. Moreover, having considered the medical evidence in the record in its entirety, including that referenced by the ALJ as well as other evidence in the record, including Plaintiff's statements to his physician in 2003 that he was capable of lifting up to 75 pounds, the Court holds that the ALJ's conclusion that Plaintiff is capable of performing light work is amply supported by substantial evidence.

### *(2) Substantial evidence supports the ALJ's finding that Plaintiff's PRW was light in exertion.*

Plaintiff testified at the hearing that he had previously worked as a housekeeping supervisor at a nursing home. Although Plaintiff had described this work in his disability application as involving primarily supervisory responsibilities (see AR 93 (Disability Report, Section 3, on which Plaintiff checked "Yes" in response to the questions, "Did you supervise other people?" and "If 'YES,' was this your main duty?")), Plaintiff now claims that he "was basically a housekeeper with some supervisory duties." (Doc. No. 17, at 2.)

The VE testified at the hearing that Plaintiff's work as a housekeeper was medium and unskilled, and his work as a supervisor was light and skilled. (AR 38.) Notwithstanding, the VE found that Plaintiff's job as housekeeping supervisor, as normally performed in the economy, is properly classified as light. Her analysis of the supervisory position was based upon DOT # 187.167-046, executive housekeeper, a light job with an SVP of 8, instead of DOT # 381.137-010, janitorial supervisor, a medium job with an SVP of 6. (AR 38–39.) The VE specifically disagreed with a prior vocational expert's evaluation (see AR 116–17), which found that Plaintiff's prior work was consistent with DOT 381.137-010, for supervisor/janitor, listed as medium. (AR 38.) According to the testifying VE, DOT 381.137-010 is for "janitor services supervisor," which includes supervising and coordinating the activities of workers engaged in cleaning and maintaining the premises of commercial and industrial and other establishments. The VE acknowledged there was not much difference between the two jobs, but based upon Plaintiff's description of his responsibilities, felt that the "housekeeper supervisor" or "executive housekeeper" was the more accurate match. (AR 39.) The ALJ specifically noted at the hearing that he would take both descriptions under consideration.

16

In his written Ruling, the ALJ noted that Plaintiff claimed his past work was "medium," but that according to the VE who testified at the hearing, DOT # 187.167-046 classified housekeeping supervisor as light skilled work. Plaintiff now argues that classifying his past work as light" does not give a true picture of Plaintiff's actual work experience, which, as the VE appeared to concede, incorporated both medium and light elements. In response, the Commissioner argues simply that step four involves consideration of the question of whether the claimant can return to his PRW, "either as the claimant actually performed it or as generally performed in the national economy," 20 C.F.R. § 404.1560(b)(2), and that substantial evidence supports the ALJ's finding that Plaintiff's PRW was light.

The Court agrees with the Magistrate that the ALJ's conclusion that Plaintiff's past work, as generally performed in the national economy, is properly classified as light. The ALJ's decision demonstrates that he carefully considered the testimony of both Plaintiff and the VE and that it is clear that his decision is supported by substantial evidence in the record, even though some of the testimony and evidence in the record supports Plaintiff's position. Because the ALJ's determination is supported by "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion," Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999), this Court must uphold it.

### (3) *Remand is not required for consideration of Plaintiff's correct age classification.*

In his "Findings," the ALJ concluded that Plaintiff was capable of performing light work and that his past relevant work experience was properly classified as light work. (AR 21.) Consequently, the ALJ found that Plaintiff was capable of performing his past relevant work as a housekeeping supervisor as it is done in the national economy. The ALJ could have stopped his analysis at that point, because a step-four conclusion that Plaintiff is able to perform his past work dictates a determination that he is not disabled. The ALJ went on to step five, however, and considered whether Plaintiff could perform other work in the economy in light of his age, education and vocationally relevant past work experience. The ALJ correctly observed that the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations contain a series of rules that may direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's residual functional capacity and vocational profile. The ALJ *incorrectly* found that Plaintiff, at age 56, was an individual "closely approaching advanced age (20 CFR § 404.1563)." (AR 20.)

In fact, Plaintiff, at age 56, had already attained "advanced age" as that term is defined by 20 C.F.R. § 404.1563(d). As the Commissioner concedes, Rule 202.02 of the Medical-Vocational Guidelines, 20 C.F.R. § 404, Subpart P, App. 2 (the "Grids"), directs a conclusion of "disabled" if a claimant is unable to perform his past work and, like Plaintiff, has reached advanced age, has a limited education or less, and has no transferable skills. Accordingly, i*f* the ALJ's conclusion that Plaintiff is capable of performing his past work were not supported by substantial evidence, outright reversal of the decision would be required—not remand.

Notwithstanding, because the Court has already determined that the ALJ's finding of no disability at step four is supported by substantial evidence, the ALJ's error at step five in concluding that Plaintiff was merely "approaching advanced age" is inconsequential. As set forth above, consideration of a claimant's age *only* enters into the equation at step five, not step four. See 20 C.F.R. § 404.1560(b)(3) ("If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. *We will not consider your vocational factors of age, education, and work experience or whether your past relevant work exists in significant numbers in the national economy.*") (emphasis added).

Because the ALJ's determinations that (1) Plaintiff's past work was light; (2) Plaintiff is capable of performing light work; and (3) Plaintiff can therefore perform his past work as it is generally performed in the national economy, are all supported by substantial evidence, the ALJ's step-four conclusion that Plaintiff is not disabled must be sustained. Consequently, remand for determination of whether a finding of disability would be required at step five based upon the fact that Plaintiff has already reached "advanced age" is not required.

## VI. CONCLUSION

As set forth above, Plaintiff's objections are overruled on the basis that the ALJ's determination that Plaintiff is capable of performing his past work is supported by substantial evidence in the record as a whole. The Commissioner's objection is sustained on the grounds that remand for consideration of the effect of Plaintiff's age on the ALJ's disability decision at step five of the sequential analysis is not required. The Court therefore **REJECTS** the Magistrate's Report and Recommendation and **DENIES** Plaintiff's Motion for Judgment. The Commissioner's decision denying benefits is **AFFIRMED**.

It is so **ORDERED**.

This is a final judgment for purposes of Rule 58 of the Federal Rules of Civil Procedure.

_____
Thomas A. Wiseman, Jr.
Senior U.S. District Judge